## PEELE'S APPEAL.

An innocent purchaser of a judgment that is confessed for the purpose of defrauding a mortgage creditor is not affected by the fraud.

An assignee of a judgment takes it subject to the equities of the defendant, but not of third parties.

Appeal from Common Pleas of Luzerne County. In Equity. No. 36 January Term, 1880.

The facts found by the master and admitted to be true were as follows:

*First.* That G. W. Green and Simon M. Green, two of the defendants, are brothers and up to the 24th October, 1873, were owners and tenants in common of a certain farm in the Township of Benton, this county, and worth at that time not less than $5,000.

*Second.* That the same was subject to lien of judgment, No. 515 August Term, 1868, in favor of John Stone, amounting to $424.92, which was subsequently assigned to Johniram Potter, and by him revived to No. 1523 October Term, 1873, for $608.

*Third.* That George W. Green had, by purchase of sewing machines from the plaintiff, become indebted to him in a considerable amount, and the latter requiring security, the two defendants, George W. and Simon M. Green, did, on the 29th September, 1871, join in a bond, accompanied by a mortgage on the Benton farm, in the sum of $3,000, in favor of the plaintiff, conditioned to secure "any and all indebtedness or liability now existing or which may hereafter in any manner exist or be incurred on the part of said G. W. Green and Simon M. Green to said Robert Peele." It being represented at the time of giving the mortgage that it would be substantially a first lien, and that there was little if any claim on the part of the owner of the judgment above stated.

*Fourth.* That the indebtedness intended to be secured by said bond and mortgage was created partly before and partly after the time of their execution, and on the 24th October, 1873, amounted to about $2,400, and was wholly incurred by said George W. Green, and no part of it by his co-obligor and co-defendant, Simon M. Green, although Peele supposed and

was informed by G. W. Green, that Simon received a portion of the goods.

*Fifth.* That shortly prior to 24th October, 1873, G. W. Green represented to the plaintiff that himself and his brother desired to effect an exchange of the Benton farm for a house and lot in Hyde Park, owned by one Benj. F. Van Fleet, and valued at $3,000; that Van Fleet was to convey to him, the said G. W. Green, the house and lot; to pay $1,000 cash, and to assume about $1,000 liens already on the farm, thus making up $5,000 as the consideration of the latter. He further represented that there was a lien of only $200 on the Hyde Park property (and which was in fact discharged before the exchange was consummated), and thereupon he proposed that Peele should satisfy his $3,000 mortgage on the farm and should receive in lieu thereof the $1,000 cash and a new mortgage on the Hyde Park property for $2,000 to cover and secure the $1,400 remaining after crediting the $1,000 cash, as well as to secure any future indebtedness.

*Sixth.* That this proposition was finally assented to by the plaintiff, and at his instance G. W. Green at once wrote to his brother, S. M. Green, to make a thorough search and report as to the existence of liens on the Hyde Park property and to "overlook nothing," and in the same letter informed him that he and Peele would come to Scranton on the 23d October, 1873, and be ready to make the transfers the following day.

*Seventh.* That pursuant to the instructions contained in that letter, Simon M. Green had the records searched for liens against the Hyde Park property and reports he found nothing.

*Eighth.* That on the 24th October, 1873, the two Greens with their wives, together with Peele, met in Scranton, and when all were present it was said that the Hyde Park lot was all right, and the Greens then executed their conveyance to Van Fleet for the Benton farm, subject to about $1,000 liens, and the same day G. W. Green received a conveyance to himself for the Hyde Park lot and $1,000 cash. The share of S. M. Green in the net proceeds of the farm being considered $2,000, his brother, without the knowledge of Peele, gave to S. M. Green a note for $2,000, containing a confession of judgment. Same day G. W. Green paid over the $1,000 to Peele

and gave the latter a mortgage for $2,000 on the Hyde Park lot, which transaction was fully known to S. M. Green, who did not then nor afterward inform Peele of his taking the note. Later in the day Peele and G. W. Green went from Scranton to the Recorder's office at Wilkes-Barre, and Peele understanding and believing his mortgage for $2,000 would be a first lien on the Hyde Park property and induced by that belief satisfied his $3,000 mortgage and left for record the $2,000 mortgage, which was recorded in Mortgage Book 27, p 176. Later still, and about the close of business hours of that same day, G. W. Green procured the $2,000 note given by him to his brother, to be entered as a judgment in the office of the Prothonotary to No. 82 November Term, 1873, that being the last case but one docketed that day. Of the entry of this judgment, and of the giving the note on which it was founded this plaintiff never had any knowledge until the receipt about 18th May, 1875, of a letter from the counsel representing the then and present owner of the judgment, Johniram Potter, one of the defendants in this case.

*Ninth.* That said judgment was assigned to Potter by S. M. Green on the 23d March, 1874, for the consideration of about $1,000, and at the same time Potter was informed by Green of the existence of the mortgage. Prior to this Potter knew of the exchange of the Benton farm for the Hyde Park house and lot, but knew nothing of the $3,000 mortgage on the farm until after it had been satisfied and after the judgment in favor of S. M. Green had been assigned to him.

*Tenth.* That at the time of said assignment, 23rd March, 1874, G. W. Green was indebted on his sewing machine transaction with Peele $2,167.59, and failing to pay up, was, in November, 1874, threatened with foreclosure of the mortgage. G. W. Green then proposed to Peele that to save expense he would convey the mortgaged premises direct to him. Peele by letter dated 5th November, 1874, replied in the following language to this proposition: "I cannot relinquish the security which I hold without the payment in full of account. If, however, you will send me a deed of the property and a guarantee of $200 rent per annum payable quarterly in advance, I will return you an agreement to wait

3 Wa 17

another year that you may have an opportunity of selling without forcing sale and thus avoid loss."

*Eleventh.* That by deed dated 12th November, 1874, and recorded in Deed Book No. 182, p 524, G. W. Green and wife conveyed to Peele the Hyde Park property, but the mortgage for $2,000 was not satisfied, and Peele subsequently learning of the $2,000 judgment, refused to enter satisfaction.

*Twelfth.* That the actual value of the Hyde Park house and lot at the time of the exchange for the farm was not more than $2,500, though valued by the parties in such exchange at $3,000.

The master recommended a decree as follows:

The master would, therefore, recommend that upon the payment by Peele to Potter, within thirty days after final decree, of the sum of $1,000, and interest from 23d March, 1874, the latter be decreed to satisfy or assign his judgment. Otherwise that the bill be dismissed and the parties left to share *pro rata* in proceeds of any sale of the premises; the mortgage being treated as a lien for the full $2,000 named in it, as more than that amount of indebtedness, which it was intended to secure, had actually been incurred prior to the time Potter acquired any rights in the $2,000 judgment.

Exceptions were filed to the master's report, which were overruled by the Court, in the following opinion, per

HANDLEY J.:

This is an application for an injunction to restrain Potter, one of the defendants, from selling certain lands, and from assigning and transferring the judgment upon which such sale is about to be made, unless a release of the lien thereof be executed. The plaintiff also prays that if the Court be of the opinion that the acceptance by the plaintiff of the conveyance mentioned in his bill of complaint did not constitute a merger, that a degree establishing the mortgage and postponing the lien of the judgment assigned to Potter be made. Also, that if the Court be of the opinion that as a matter of law, the acceptance of the deed in question constitutes such a merger, that a decree restraining the said Potter

from in any manner setting up and availing himself of the said judgment as against the plaintiff, or upon the said land, until the payment in full of all indebtedness secured by said mortgage, with interest and costs.

It was conceded by counsel for plaintiff on the argument of these exceptions that the facts in this case were correctly found, but that the master erred in the law.

There can be no doubt but that the deed to Peele was not intended for any other purpose than as additional security to the mortgage. Hence there was no merger, because the moment the debt in question is paid Peele is in duty bound to mark the mortgage satisfied, and to reconvey the premises to the original grantor.

On the day the transfer of the property in question was made, one defendant executed his judgment note to the other defendant, and this note was entered on the same day the mortgage in question was executed.

That a fraud was intended upon the plaintiff by these two defendants there can be no more doubt than that the transaction of which the plaintiff complains took place. How, then, is Potter affected by this fraud?

The master says, as a purchaser for value, and without notice, Potter is entitled at least to the amount actually paid by him, to protection against all the world, except the defendant. The equities to which his purchase is subject are those residing in the defendant only, and not in third parties. The whole question is fully reviewed, and the authorities cited and discussed in Wethrill's Appeal, 3 Gr., 283. Judge Strong asks in this case: Is, then, the assignee of a chose in action affected by secret equities existing against his assignor, not in the debtor, but in third persons, of which he had no notice when he purchased? This is a question, adds the Judge, not free from difficulty, and not fully settled by authority. It is not easy to see how an assignee can take an interest superior to that which the assignor had to give. An outstanding equity against the owner of a chose in action is an ownership of part of the title to it, or a deduction from its value. If

this ownership or a right of deduction be in the debtor, all the cases agree that an assignment of the chose passes it to the transferee with all its defects upon it. Is not an equity in a third person as much a defect in title as if it existed in the obligor? Yet it has not been so treated.

In the case of Murray vs. Lylburn, 2 Johns, Ch. Rep. 441, Chancellor Kent held that it is a general and well settled principle that the assignees of a chose in action take it subject to the same equities it was subject to in the hands of the assignor. But this rule is generally understood to mean the equity residing in the original obligor or debtor, and not an equity residing in some third person against the assignor.

We have no doubt, as we have said before, but that a fraud has been practiced on the plaintiff in this case, but the evidence fails to show that Potter knew it. The doctrine distinctly announced in Hendrickson's Appeal, 12 Harris, 363, protects Potter, the assignee in the judgment, at least to the extent of the amount paid for the same, with interest from the date of the assignment. We have examined the whole evidence in this case with care, and also the several cases cited in the elaborate brief of counsel for the plaintiff, but to no avail, so far as this transaction is concerned between Peele and Potter.

The case of Claason's Appeal, 10 Harris, 359, was decided on an entirely different state of facts from the facts in the present case.

Exceptions overruled, and report of the master confirmed.

———————————

Peele then appealed to the Supreme Court, complaining of the action of the Court in holding that the judgment passed to Potter free from any fraud; and second, in not holding that Potter was only entitled to a *pro rata* share of the $1,000 he actually paid.

*G. M. Lewis and 'E. P. & J. V. Darling,* for appellant, cited: Britton's Appeal, 45 Pa., 177; Himes vs. Barnitz, 8 W., 39; Thompson's Appeal, 57 Pa., 178; Bank vs. Fordyce,

9 Pa., 275 ; Taylor's Appeal, 45 Pa., 71 ; Claason's Appeal, 22 Pa., 359 ; Roadarmel's Estate, 53 Pa., 306.

The Supreme Court affirmed the decree of the Common Pleas on March 21st, 1881, in the following opinion,

PER CURIAM:

This decree is affirmed on the opinion of the learned Judge of the Court below.

Decree affirmed and appeal dismissed at the costs of the appellant.